**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| : | Chapter 11 |
| : | |
| : | Case No. 19-11644-amc |
| In re: : | Jointly Administered |
| : | |
| CHERRY BROS., LLC, *et al.*, : | **Objections Due: TBD** |
| : | **Hearing Date: TBD** |
| Debtors.[1] : | **Hearing Location: Courtroom #4** |
| : | **Robert N.C. Nix Sr. Federal Courthouse, 900 Market** |
| : | **Street, Philadelphia, Pennsylvania 19107** |

**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO**
**11 U.S.C. §§ 105 AND 364 (A) AUTHORIZING POSTPETITION FINANCING,**
**(B) SCHEDULING A FINAL HEARING, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
hereby file this motion (this "Motion") for entry of an Interim Order (the "Interim Order") and a
Final Order (the "Final Order," and together with the Interim Order, the "DIP Orders") pursuant
to title 11 of the United States Code (the "Bankruptcy Code"), including sections 105 and 364
thereof, and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), including
Rule 4001, and the Local Bankruptcy Rules of the United States Bankruptcy Court for the
Eastern District of Pennsylvania (the "Local Bankruptcy Rules"), including Local Rule 4001-1,
seeking, among other things:

(i)    authorization for the Debtors to obtain a postpetition financing facility (the "DIP
Facility"), in the form of a delayed draw, multiple draw term loan in the aggregate amount of up
to $1,025,000 pursuant to the terms and conditions set forth in the DIP Orders from CDFund,
LLC (the "Lender");

(ii)    authorization for the Debtors to perform such acts as may be required in

---

[1]    The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's
federal tax identification number, are: Cherry Bros., LLC (0061); and C. Bros Holdings, LLC (3923). The
principal place of business of the Debtors is 707 N. Valley Forge Road, Suite 102, Lansdale, Pennsylvania
19446.

furtherance of the DIP Facility and the DIP Orders;

(iii)    authorization for the Debtors to draw on the DIP Facility in an amount not to exceed the Initial Availability (as defined below), subject to the conditions precedent set forth herein and in the DIP Orders, and to use proceeds of the DIP Facility to pay for, among other things, working capital and general corporate purposes of the Debtor and the administration of these chapter 11 cases (collectively, the "Cases"), but only in accordance with the budget attached hereto as Exhibit A (the "DIP Budget");

(iv)    granting to the Lender an automatically perfected, first-priority, priming lien  on the DIP Collateral (as defined below) to secure the DIP Facility and all obligations arising thereunder (collectively, the "DIP Obligations");

(v)    pursuant to Bankruptcy Rule 4001, that an interim hearing on the Motion (the "Interim Hearing") be held before this Court to consider entry of the proposed Interim Order; and

(vi)    scheduling a final hearing (the "Final Hearing") on or before April 29, 2019 to consider entry of the Final Order[2] authorizing the balance of the credit available under the DIP Facility and any requested relief not granted under the Interim Order on a final basis, all as set forth in this Motion.

In support of the Motion, the Debtors respectfully state as follows:

---

[2]    The only substantive difference between the Interim Order and the Final Order will be that the Final Order shall authorize the Debtors to draw upon the full availability of the DIP Facility, whereas the Interim Order shall limit the Debtors' borrowings to the Initial Availability.

## JURISDICTION

1.          This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.          The bases for the relief requested herein are sections 105(a) and 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and Local Bankruptcy Rule 4001-1.

## BACKGROUND

### A.      Overview of the Debtors' Business

3.          Headquartered in Lansdale, Pennsylvania, with sales representatives across the country, the Debtors are the leading supplier of fundraising programs and productions to schools and non-profit organizations.  In addition to signature candies and confections, the Debtors' product selection includes, among other things, gourmet foods, designer jewelry, home décor, gardening kits, magazines, and gift wrap.

4.          The Debtors do business as "Cherrydale Farms."

### B.      The Debtors' Need for Protection Under Chapter 11 of the Bankruptcy Code

5.          The Debtors commenced the Cases on March 18, 2019 (the "Petition Date"), in order to permit the Debtors' businesses to continue as a viable going concerns while the Debtors evaluate strategic alternatives.

6.          The Debtors continue to operate their businesses and manage their estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.          On April 2, 2019, the Office of the United States Trustee appointed an official committee of unsecured creditors of the Debtors (the "Committee").

C.    **The Debtors' Prepetition Secured Indebtedness**

8.      As set forth in further detail in the *Motion of the Debtors and Debtors-in-Possession, Pursuant to 11 U.S.C. § 105, 361, 362 and 363 and Fed. R. Bankr. P. 4001, (I) Authorizing Use of Cash Collateral on an Interim and Permanent Basis; (II) Granting Adequate Protection; (III) Scheduling Final Hearing and Prescribing Form and Manner of Notice; and (IV) Granting Related Relief* (D.I. 18):

   (a)    Brian G. McElwee, as collateral agent under that certain Funding Agreement dated April 17, 2018 (the "McElwee Lender") has first priority liens and security interests in substantially all of the personal property of Debtor Cherry Bros., LLC in the unpaid principal amount of $189,000 as of 5:00 p.m. EST on the Petition Date (the "McElwee Prepetition Indebtedness"); and

   (b)    Martin Cherry (the "Martin Cherry Lender"), pursuant to that certain demand note dated December 31, 2018 and related loan documents, has second priority liens and security interests in substantially all of the personal property of Debtor Cherry Bros., LLC in the unpaid principal amount of $2,725,000 as of 5:00 p.m. EST on the Petition Date (the "Martin Cherry Prepetition Indebtedness").

9.      On March 22, 2019, the Court entered the *Stipulation and Agreed Interim Order Granting the Motion of the Debtors and Debtors-in-Possession, Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed. R. Bankr. R. 4001, (I) Authorizing Use of Cash Collateral on an Interim and Permanent Basis; (II) Granting Adequate Protection; (III) Scheduling Final Hearing and Prescribing Form and Manner of Notice; and (IV) Granting Related Relief* (D.I. 40) (the "Interim Cash Collateral Order").

D.    **The Debtors' Sale Process and The Need For Financing**

10.      The Debtors, in consultation with their advisors, believe that the preservation of the Debtors' businesses is key to maximizing value for the benefit of the estates.  In the months surrounding the Petition Date, the Debtors explored, on their own and with the assistance of investment banking professionals, potential strategic alternatives with various potential counterparties.

11.     In connection with those efforts, the Debtors engaged in negotiations with the Lender as to the terms of a potential sale transaction.  These negotiations culminated in an asset purchase agreement (for a purchase price of $3 million plus certain assumed liabilities) which the Debtors have sought to present as a "stalking horse bid" (the "Stalking Horse APA") in a bankruptcy sale process proposed in the *Motion of the Debtors and Debtors in Possession for Entry of an Order (I) Approving Bid Procedures, and (II)(A) Approving an Asset Purchase Agreement Between the Debtors and the Stalking Horse, or such other Purchase Agreement Between the Debtors and the Prevailing Bidder; (B) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (D.I. 78) (the "Sale Motion"), filed on April 4, 2019.

12.     Nevertheless, in light of their current seasonal downturn and ongoing operational challenges, the Debtors lack the liquidity to survive as a going concern through the projected May 16 closing date proposed by the Sale Motion.  The Lender, in connection with its stalking horse bid, has offered to provide the DIP Facility of $1,025,000 (which will be credited to the Lender's purchase price obligation under the Stalking Horse APA) in order to fund the sale process.  The DIP Facility is interest-free and without fees, and the DIP Obligations will only be secured by the proceeds of any "alternative transaction" (*i.e.*, a winning bid other than the Stalking Horse APA) on a first-priority, priming lien basis pursuant section 364(d)(1) of the Bankruptcy Code.  Moreover, the DIP Facility is largely free of typical overreaching, pro-lender provisions.

13.     As a result of the Debtors' current situation, an immediate and critical need for financing exists.  Without the financing proposed by this Motion, the Debtors would not have the

necessary funds to pay the costs of administration of the estates (*i.e.*, providing the runway necessary to consummate the sale and obtain confirmation of a chapter 11 plan) or satisfy other working capital and operational needs, thereby being forced to cease operations and liquidate. The access to sufficient working capital and liquidity through the incurrence of new indebtedness is thus vital for preserving and maintaining the value of the Debtors' businesses and the prospects of a successful reorganization. Failure to obtain the relief requested in this Motion will immediately and irreparably harm: (i) the Debtors, their estate, creditors and equity holders; and (ii) the possibility of a successful reorganization in lieu of a liquidation.

14.     The Debtors are unable to obtain: (i) unsecured credit allowable as an administrative expense; or (ii) junior or *pari passu* secured credit, on equal or more favorable terms than those offered by the Lender under the DIP Facility. A credit facility in the amount and under the terms provided under the DIP Facility is not available from the Lender without the Debtors granting to the Lender the priming lien on the DIP Collateral and providing the other terms set forth in the DIP Orders.

**E.     The Development of the Approved Budget**

15.     The proposed DIP Budget is attached hereto as <u>Exhibit A</u>. To best assess the Debtors' funding needs during these Cases, the Debtors, with the assistance of their advisors, analyzed cash needs to determine what is necessary to maintain operations in chapter 11 long enough to consummate a sale, obtain confirmation of a chapter 11 plan, and avoid a liquidation.

16.     As part of the financial review and analysis, the Debtors developed a cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period. This forecast considers a number of factors, including material cash disbursements and cash flows from the Debtors' ongoing operations.

17.    Utilizing this cash flow forecast to project the Debtors' cash needs during these Cases, the Debtors believe that that proposed DIP Facility will provide the Debtors with sufficient liquidity.   The immediate availability of the DIP Facility is necessary satisfy the Debtors' liquidity needs for the benefit of the Debtors' estate and its various constituencies.

18.    The Debtors, in consultation with their advisors, have determined that the DIP Budget: (i) is reasonable and will allow the Debtors to operate in these Cases; and (ii) includes all reasonable, necessary, and foreseeable expenses to be incurred for the period set forth in the DIP Budget.

**F.    Concise Statement Pursuant to Bankruptcy Rule 4001(c)**

19.    Pursuant to Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-1, the Debtors submit this concise statement of the material terms of the DIP Facility:

| Provision | Summary Description |
|---|---|
| **Facility Amount** | $1,025,000: <br> • $225,000 to fund spring inventory purchases <br> • $800,000 to fund working capital, general overhead, and restructuring expenses <br><br> "Initial Availability" of $650,000 through Final Hearing |
| **Use of Funds** | Proceeds of the DIP Facility shall be used only for operations, general corporate purposes, and administrative expenses as set forth in the DIP Budget; provided, however, that: (i) the Debtors shall be permitted to exceed expenses on a monthly basis, in the DIP Budget by an amount not to exceed 5% of total expenses set forth in the DIP Budget and as otherwise provided in the Interim Cash Collateral Order; and (ii) the DIP Facility shall be subject to the same terms and conditions as set forth in paragraphs 4, 5, and 6 of the Interim Cash Collateral Order. |
| **Interest Rate** | Interest free. |
| **Fees and Expenses** | None. |
| **Maturity Date** | May 16, 2019 |

| Provision | Summary Description |
|---|---|
| **Conditions to Borrowing** | The Lender's obligation to fund the Initial Availability shall be conditioned on: (i) entry of the Interim Order; and (ii) no Event of Default existing.<br><br>The Lender's obligation to fund amounts beyond the Initial Availability shall be subject to the following conditions precedent: (i) entry of the Final Order; and (ii) no Event of Default existing. |
| **"Milestones"** | • On or before May 9, 2019, an order approving the Sale Motion shall have been entered by the Bankruptcy Court.<br><br>• On or before May 16, 2019, the Debtors and Lender shall have consummated the Stalking Horse APA. |
| **Events of Default resulting in potential Termination** | The following constitute "Events of Default" under the DIP Facility: (i) the Cases are converted to cases under chapter 7 of the Bankruptcy Code or dismissed; (ii) failure to meet any of the Milestones; (iii) material noncompliance with the DIP Budget remaining uncured after 5 business days; and (iv) termination of the Stalking Horse APA pursuant to Section 10.1(a) thereof, including termination due of (a) a material breach of any covenant or agreement to be performed or complied with by the Debtors if such breach would result in the failure of closing conditions to be satisfied, or (b) any governmental/regulatory body having jurisdiction prohibiting such transaction. |
| **Priming DIP Lien pursuant to §364(d)(1) and Adequate Protection** | The DIP Obligations shall be secured by a first-priority, priming lien on the proceeds of any sale consummated pursuant to the Sale Motion other than a sale to the Lender (the "DIP Collateral").<br><br>The Debtors believe that both the McElwee Lender and the Martin Cherry Lender consent to the granting of the first-priority, priming lien on the DIP Collateral because: (i) a massive equity cushion exists with respect to the McElwee Prepetition Indebtedness; and (ii) the Martin Cherry Lender's overall collateral value will decrease substantially if the DIP Facility is not approved, thereby causing operations to cease. |
| **Superpriority Administrative Claims pursuant to §364(c)(1)** | None. |
| **Bankruptcy Code Section 506(c) Waiver** | None. |

| Provision | Summary Description |
|---|---|
| **Business Terms Related to Stalking Horse** | During the term of the DIP Facility, the Debtors' sales representatives shall use the Stalking Horse's sales software system until closing; provided, however, such any sales of the Debtors shall be separately tracked and segregated and any accounts receivable resulting therefrom shall be property of the Debtors. |
| **Absence of Other Pro-Lender Provisions** | The Lender does not hold any prepetition claim against the Debtors. |
| | The DIP Facility does **not** include any: (i) cross-collateralization; (ii) granting of adequate protection to prepetition claims of the Lender; (iii) binding determinations of validity, priority, or amount of prepetition claims of the Lender; (iv) waiver of the automatic stay; (v) releases or waivers of claims in favor of the Lender; (vi) granting of liens on avoidance actions; (vii) "roll-up" of prepetition debt into position debt; (viii) disparate treatment of professional fees; or (ix) waivers of the "equities of the case" consideration under section 552(b)(1) of the Bankruptcy Code. |

## Supporting Authority

### A.    Financing Under Section 364(d)(1) of the Bankruptcy Code

20.    Since the DIP Collateral constitutes the proceeds of the collateral of the McElwee Lender and the Martin Cherry Lender, the Debtors seek to grant a first-priority, priming lien to the Lender pursuant to section 364(d)(1) of the Bankruptcy Code.   Section 364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  Section 364(d)(2) of the Bankruptcy Code provides that "the trustee has the burden of proof on the issue of adequate protection."

21.     Despite their best efforts, the Debtors were unable to secure financing on an unsecured, administrative expense, junior lien, or *pari passu* basis.  In light of the foregoing, the Debtors submit that these efforts satisfy the requirements of section 364(d)(1)(A).  *See In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (in context of section 364(c), holding that a debtor or trustee is not required to seek credit from every possible source, but must make a reasonable effort to seek other sources of credit).

22.     Moreover, the Debtors believe that both the McElwee Lender and the Martin Cherry Lender agree that their interests in the Debtors' personal property will be adequately protected under the DIP Facility notwithstanding the granting of the first-priority, priming lien on the DIP Collateral.  In light of the $3 million purchase price offered by the Stalking Horse APA, a massive equity cushion exists with respect to the McElwee Prepetition Indebtedness notwithstanding the priming lien.  With respect to the Martin Cherry Indebtedness, the Martin Cherry Lender will be adequately protected through the Debtors' use of the DIP Facility proceeds because the Martin Cherry Lender's overall collateral value will decrease substantially if the Debtors do not obtain financing and, as a result, cease operations.  If the Debtors obtain the financing for purposes of funding a going concern sale process, the value of the Martin Cherry Lender's collateral won't diminish (and hence the Martin Cherry Lender is adequately protected).

23.     Courts grant considerable deference to a debtor's business judgment in determining whether to permit a debtor to incur postpetition financing. *See id.* ("[c]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to

benefit the estate as it is to benefit a party-in-interest").  The funds to be provided under the DIP

Facility are necessary and critical to the continued operation of the Debtors' businesses and the

preservation of the Debtors' assets for the benefit of all of the estates' constituents.  Absent this

added liquidity, the Debtors will be unable to make required payments to preserve the Debtors'

businesses, and will be forced into a value-destructive liquidation.  The DIP Facility not only

provides sufficient funds to maintain operations, but also to fund administrative expenses of the

Debtors' estates, including U.S. Trustee fees and other expenses.  Moreover, in light of the

Debtors' situation, the Lender could have required much more overreaching terms.  The Lender,

however, only gains an interest in the DIP Collateral in the event of a sale generating in excess of

$3 million in proceeds to the estates.  In light of the foregoing, the Debtors submit that entry into

the DIP Facility represents the valid exercise of their business judgment.

**B.      Approval of the Postpetition Debt on an Interim Basis is Necessary to Prevent
         Immediate and Irreparable Harm.**

        24.      Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization

to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for
> authority to obtain credit no earlier than 14 days after service of
> the motion.  If the motion so requests, the court may conduct a
> hearing before such 14-day period expires, but the court may
> authorize the obtaining of credit only to the extent necessary to
> avoid immediate and irreparable harm to the estate pending a final
> hearing.

Fed. R. Bankr. Proc. 4001(c)(2);

        25.      In examining requests for interim relief under the immediate and irreparable

harm standard, courts apply the same business judgment standard applicable to other business

decisions.  *See, e.g.*, *id.* at 36.  After the 14-day period, the request for financing is not limited to

those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.

26.    The Debtors would suffer immediate and irreparable harm absent entry of the Interim Order and immediate access to the DIP Facility.  As described herein, the Debtors have an immediate need to obtain access to liquidity to preserve value for the benefit of all stakeholders.  Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

## Request For Final Hearing

27.    Pursuant to Bankruptcy Rules 4001(c)(2), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than April 29, 2019, and fix the time and date prior to the final hearing for parties to file objections to this motion.

## Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

28.    To implement the foregoing successfully, the Debtors seek a waiver of any notice requirements that may exist by virtue of Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein under Bankruptcy Rule 6004(h) or otherwise.

## Notice

29.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Lender; (ii) the U.S. Trustee; (iii) the McElwee Lender; (iv) the Martin Cherry Lender; (v) counsel to the Committee; and (vi) parties requesting notice in this Case.  In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## **No Prior Request**

30.      No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully requests that this Court enter the Interim Order, substantially in the form attached hereto: (i) authorizing the Debtors' entry into the DIP Facility; (ii) scheduling the Final Hearing; and (iii) granting such other and further relief as may be appropriate.

Dated:   April 5, 2019

**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**

_/s/ Michael J. Barrie_
Michael J. Barrie (PA Bar No. 85626)
Jennifer R. Hoover (PA Bar No. 87910)
1650 Market Street, Suite 3628
Philadelphia, PA  19103
(267) 207-2947 (Telephone)
(267) 207-2949 (Facsimile)

_Proposed Counsel for the Debtors
and Debtors in Possession_